IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20100072-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (August 23, 2012) |
| Andrew Lebeau, | ) | |
| | ) | 2012 UT App 235 |
| Defendant and Appellant. | ) | |

-----

Third District, West Jordan Department, 091400631
The Honorable Terry L. Christiansen

Attorneys:      Linda M. Jones and Brittany D. Enniss, Salt Lake City, for Appellant
                Mark L. Shurtleff and Jeanne B. Inouye, Salt Lake City, for Appellee

-----

Before Judges Orme, Roth, and Christiansen.

ORME, Judge:

¶1      Defendant Andrew Lebeau appeals his convictions of aggravated kidnapping, a first-degree felony, *see* Utah Code Ann. § 76-5-302 (2008);[1] aggravated assault, a third-degree felony, *see id.* § 76-5-103 (Supp. 2012); failure to respond to an officer's signal to stop, a third-degree felony, *see id.* § 41-6a-210 (2010); and cruelty to an animal, a class B misdemeanor, *see id.* § 76-9-301(2) (2008).  Defendant asserts that his convictions were

_____

[1]Because the statutory provisions in effect at the pertinent time do not differ materially, in any way relevant to this appeal, from the provisions currently in effect, we cite the current version of the Utah Code for the convenience of the reader.

tainted by prosecutorial misconduct. He also appeals his life without parole sentence on his conviction for aggravated kidnapping. Imposition of this sentence, usually reserved for capital offenses, is indeed troubling. Nonetheless, we must affirm.

BACKGROUND

¶2 Defendant was charged in March 2009. During a three-day trial in September of that year, Defendant entered a guilty plea for failure to respond to an officer's signal to stop. The jury found Defendant not guilty of attempted murder but convicted him of aggravated kidnapping, aggravated assault, and cruelty to an animal. The trial court sentenced Defendant as follows: for count I, aggravated kidnapping, life in prison without the possibility of parole; for count II, aggravated assault, a prison term not to exceed five years; for count III, failing to respond to an officer's signal to stop, a prison term not to exceed five years; and for count IV, cruelty to an animal, a suspended jail term of 180 days. The court ordered the prison terms on counts II and III to run consecutively to count I, and it ordered full restitution.

I. Factual Background[2]

¶3 Defendant and his girlfriend (Girlfriend) had lived together for about eighteen months as of the time of the events giving rise to this case. According to Girlfriend, they had a "pretty good relationship" for about a year, but by late 2008 "things had changed quite a bit."

¶4 In February 2009, Girlfriend moved out of the bedroom she shared with Defendant and into a different room in the house. Both Defendant and Girlfriend regularly used drugs that they purchased from a friend of Defendant (Friend). Around the time Girlfriend moved to her own room, Defendant became suspicious that Girlfriend was seeing Friend for purposes unrelated to drug purchases. Girlfriend testified that Defendant became so suspicious that he once tampered with her car to keep her from going out.

---

[2]Except where a factual conflict is relevant to the resolution of an issue on appeal, "we review the record facts in a light most favorable to the jury's verdict." *State v. Jeffs*, 2010 UT 49, ¶ 3, 243 P.3d 1250 (citation and internal quotation marks omitted).

¶5     Later that month, Girlfriend left the house to do various errands and to see Friend. She returned home around 5:30 p.m., but left again and spent the evening with Friend. Throughout the day and evening, Defendant called her a number of times and sent her text messages. She answered one or two of his calls but then turned off her phone. Defendant left her multiple voicemail messages that went unanswered. When Girlfriend returned home around 10:30 or 11:00 p.m., Defendant angrily confronted her. She did not want to talk or fight, and she refused to tell him where she had been. Defendant then sat on her, broke her phone, hit her in the face and head, and tried to choke her. Eventually, she admitted she had been with Friend.

¶6     Defendant and Girlfriend continued to argue, while also using drugs. At one point during the evening, Defendant told Girlfriend, "You better not run, because I'll catch you." Defendant eventually took her into the garage, which he had previously modified by permanently sealing the bay door. The only remaining entrances to the garage were two locked doors, to which Girlfriend had no keys. Defendant left Girlfriend there alone for a few minutes. When he returned, he "beat [her] down," yelled at her, and ripped her clothes to "tattered shreds." He threw a cue ball at a mirror and shattered it. He eventually told her they were going for a "fast ride." Speaking to his dog, Sally, Defendant said, "Sorry that you have to come along with us," "Sorry you've got to go down with it," and "If she just hadn't have broke our heart, you know, this—this wouldn't have to happen." Before leaving, he wrote the date and following verse on the wall: "I was here, but now I'm gone. Those who knew me knew me well; those who didn't can go to hell. See you there."

¶7     Girlfriend, Defendant, and Sally then walked to Defendant's car, which was parked in the driveway, and Girlfriend got into the passenger seat. Defendant put Sally in the back seat and got behind the wheel. Before getting into the car, Girlfriend smoked marijuana and Defendant took some pills, including Lortab and morphine. Defendant then drove toward Friend's neighborhood. As they were driving, Girlfriend saw a police officer in a nearby vehicle and "stared at him," hoping to get his attention. Having observed that Defendant's car lacked a rear license plate, the officer followed the car and eventually engaged his emergency lights. Defendant was driving at about 25 miles per hour at that point. Girlfriend screamed at Defendant to pull over, but he did not stop.

¶8     Defendant drove to the street where Friend lived. Once there, he pulled into a driveway, turned around, and headed back toward the police car. The officer

maneuvered his car out of the way to avoid being hit. Defendant then drove his car toward Friend's truck, which was parked at the end of the dead-end street. As he did so, Girlfriend opened her door. Defendant accelerated as he drove toward the truck. When he hit Friend's truck, the impact pushed the truck through a fence, and it eventually came to rest forty-three feet from its location at the curb. An accident reconstruction specialist estimated that Defendant was traveling at about 58 miles per hour when he hit the truck. Another officer who observed the event testified that he saw no brake lights as Defendant headed toward the truck. He also saw Girlfriend ricochet off the passenger side door and into the street as the car hit the truck. Girlfriend suffered severe injuries. The dog was also injured and required surgery. Defendant was not seriously hurt.

## II. Background Regarding Prosecutorial Misconduct

¶9     In closing arguments, during his rebuttal, the prosecutor talked about the trial testimony at length. Regarding the State's witnesses, the prosecutor stated that the doctors, toxicologists, and police officers had no "personal interest in the outcome of this case" and were unbiased and independent witnesses. He argued that Girlfriend "has nothing to gain" and "no motive to lie." The prosecutor also stated that the consistency of Girlfriend's statements should assure the jury that she had "an excellent memory, and excellent knowledge of the events." The prosecutor also stated that Defendant's witnesses were all close friends or family members who did not "want to see their brother, their son, their pal; they [did not] want to see him go to jail." The prosecutor said that Defendant had the "biggest motive to tell [the jury] what [it] want[ed] to hear. He's got a lot at stake. He makes an effort to help himself out." The prosecutor stated that Defendant, in a telephone call from jail, had lied to Girlfriend about whether he remembered what happened. The prosecutor described inconsistencies between Defendant's testimony and the testimony of other witnesses.

¶10     The prosecutor also commented about the lack of evidence corroborating Defendant's story. Concerning Defendant's testimony that he spent some time on the day of his crimes buying a shirt as a gift for one of his friends, the prosecutor stated that this friend did not testify about the gift. Regarding Defendant's sister's testimony that the verse Defendant wrote on his door before leaving the garage was one of Defendant's favorite sayings and that he had previously written it on the wall of his mother's Alabama home and in his school yearbook, the prosecutor pointed out that the sister did not bring a copy of the yearbook or a picture of the wall to support her

testimony. The prosecutor also stated that Defendant's mother was not questioned about the verse and further stated that there was "no corroborative evidence to show [the jury] that any of those claims [that Defendant had quoted the verse before] are reliable."

¶11 With regard to whether Defendant had the required intent to commit the alleged crimes, the prosecutor stated:

> Defense Counsel brought up in his opening statement this issue of is this an accident or is it intentional? He's correct in saying that intent, it's a high state of mind. So let's look at some of the evidence, and help you determine whether or not this was an accidental or intentional act.
>
> I'll go – I'll start by telling you, I submit to you that it is an intentional act. So what do I use to come to that conclusion? Look at the intentional acts of the defendant. He intentionally disabled [Girlfriend]'s car. . . . He intentionally broke [Girlfriend]'s phone. He intentionally took [Girlfriend]'s keys.
>
> He intentionally hit [Girlfriend] repeatedly in the face; intentionally strangled her; intentionally threatened her not to run; . . . intentionally threw the pool ball at [Girlfriend], specifically her head; intentionally wrote the [verse], . . . ; intentionally said, "We're going on a fast ride"; intentionally apologized to Sally for having to do this; intentionally took hits of crack; intentionally took a handful of pills; intentionally put the dog in the car.
>
> Intentionally drove to [Friend]'s house; intentionally refused to yield to police; intentionally ignored [Girlfriend]'s pleas to stop the car; intentionally turned right on [Friend's street]; intentionally pulled in the driveway and turned around; intentionally drove past [the officer], almost hitting him; intentionally drove down [Friend's street] at approximately 60 miles an hour; intentionally turned into

the truck just prior to the impact.  He intentionally crashed
into [Friend]'s parked cargo truck . . . .

¶12    The prosecutor also made some statements regarding the evidence that
Defendant contends were inaccurate or misleading.  Regarding the facial fractures that
Girlfriend sustained, the prosecutor stated that a doctor had testified that "a punch or a
hit to the face can cause [injuries such as] these," implying that Defendant caused those
injuries when he hit Girlfriend before they left the house.  He also stated that Defendant
had disabled Girlfriend's car on the day of the incident.

### III.  Background Regarding Sentencing

¶13    At the sentencing hearing, Defendant raised several mitigating factors including
the following:  (1) Defendant acted under strong provocation, (2) incarceration would
severely compromise Defendant's ability to make restitution, (3) Defendant had
community support based on his good employment history and family relationships,
(4) imprisonment would cause Defendant's dependents excessive hardship, (5)
Defendant had enjoyed an extended period of time when he had not been arrested for a
crime, and (6) the offenses all arose from a single criminal episode.  Defendant also
argued during the sentencing hearing that the trial court should impose a sentence that
would allow the Board of Pardons and Parole to assess Defendant's progress toward
rehabilitation.

¶14    The trial court expressly discussed each of Defendant's proffered mitigating
factors at the hearing.  The court then sentenced Defendant.  On the aggravated
kidnapping count, the court sentenced Defendant to life in prison without parole.

### ISSUES AND STANDARDS OF REVIEW

¶15    Defendant argues that the State committed misconduct during closing argument.
Ordinarily, we review rulings on prosecutorial misconduct for abuse of discretion.  *See*
*State v. Tilt*, 2004 UT App 395, ¶ 11, 101 P.3d 838.  However, because Defendant raises
the issue of prosecutorial misconduct for the first time on appeal, we review the claim
under the doctrine of plain error.  *See State v. Nelson-Waggoner*, 2004 UT 29, ¶ 16, 94 P.3d
186.  In addition, Defendant contends that we may consider his claim of prosecutorial

misconduct under the doctrine of ineffective assistance of counsel because his trial counsel did not object contemporaneously.

¶16    Defendant also argues that the trial court abused its discretion when it failed to properly consider the interests of justice in sentencing Defendant to life in prison without the possibility of parole for aggravated kidnapping. "We will set aside a sentence only if the sentence represents an abuse of discretion, if the trial judge fails to consider all legally relevant factors, or if the sentence imposed exceeds the limits prescribed by law." *State v. Tryba*, 2000 UT App 230, ¶ 10, 8 P.3d 274 (citation and internal quotation marks omitted).


ANALYSIS

I.  Prosecutorial Misconduct

¶17    Defendant first argues that the prosecutor engaged in misconduct during the rebuttal portion of closing argument. Specifically, he contends that by claiming that Defendant's witnesses could not be believed because they did not present physical evidence to corroborate their statements, the prosecutor improperly expressed his opinion regarding the credibility of witnesses, "emphasized a lack of credibility for the defense witnesses," distorted the burden of proof, and presented an incorrect impression of the law. Defendant also contends that the prosecutor misstated the prosecution's burden and the law relating to the element of criminal intent when he repeatedly used the word "intentionally" while describing Defendant's activities on the day in question. Finally, Defendant argues that the prosecutor misstated certain facts regarding when Defendant disabled Girlfriend's car and when Girlfriend suffered facial fractures.

¶18    Defendant acknowledges that he did not preserve the issue of prosecutorial misconduct, but he contends that we can nonetheless review his claims under the doctrines of plain error and ineffective assistance of counsel. For a defendant to establish plain error, he must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful," i.e., prejudicial. *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). To show ineffective assistance of counsel, a defendant must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984), by proving (1) that his counsel rendered deficient performance that fell

below an objective standard of reasonable professional judgment and (2) that counsel's deficient performance prejudiced the defendant. *See id.* at 687.

¶19 The State concedes that the prosecutor misstated the facts regarding when Defendant disabled Girlfriend's car. However, neither that fact nor the prosecutor's statements relating to when the victim's facial fractures occurred implicate any elements of the charged offenses. Therefore, we conclude that any error related to those statements is harmless.

¶20 In reviewing the other challenged statements for prosecutorial misconduct, we must view those statements "in context of the arguments advanced by both sides as well as in context of all the evidence." *State v. Bakalov*, 1999 UT 45, ¶ 56, 979 P.2d 799. We have carefully reviewed the prosecutor's rebuttal argument in its entirety, and we conclude that these statements were not improper. While "a prosecutor engages in misconduct when he or she expresses personal opinion or asserts personal knowledge of the facts[,] . . . a prosecutor may draw permissible deductions from the evidence and make assertions about what the jury may reasonably conclude from those deductions." *Id.* ¶ 57 (citation omitted). *See id.* (concluding that the prosecutor did not err when he stated, "You know that [the victim] told the truth" and "She told the truth," because those statements constituted assertions about what the jury may reasonably have inferred from the evidence). Here, when the prosecutor referred to the lack of witness credibility and the inconsistency of witness testimony, he was merely drawing inferences based on the evidence and suggesting to the jury that it do the same. Similarly, the prosecutor did not act improperly when he pointed out the lack of corroborating evidence. Again, the prosecutor's statements invited the jury to infer from the evidence that certain testimony might not be entirely credible. "[T]he prosecution has the duty to argue the case based on the total picture of the evidence or lack of evidence, including the paucity or absence of evidence adduced by the defense." *State v. Tilt*, 2004 UT App 395, ¶ 18, 101 P.3d 838 (alteration in original) (citation and internal quotation marks omitted). Therefore, the prosecutor's statements regarding witness testimony did not constitute misconduct.

¶21 Finally, Defendant objects to the prosecutor's repeated use of the word "intentionally." He insists that the repetition of this word misrepresented the State's burden to prove criminal intent as to the kidnapping and assault charges and that it misled the jury regarding the intent element of these offenses. Defendant argues that this confused the jury by implying that Defendant's intent to perform other acts, for

example, intentionally apologizing to his dog or intentionally writing his verse on the wall, would "qualify as criminal intent for the offenses in this case."

¶22    Intent is usually established by inference. *See State v. Jenson*, 280 P. 1046, 1048 (Utah 1929). *See also State v. Colwell*, 2000 UT 8, ¶ 43, 994 P.2d 177 ("We have held that intent to commit a crime may be inferred from the actions of the defendant or from surrounding circumstances.") (citation and internal quotation marks omitted).  And the jury was so instructed in this case:  "Intent, being a state of mind, is seldom susceptible of proof by direct and positive evidence and may ordinarily be inferred from acts, conduct, statements and circumstances."  Here, the prosecutor's repetition of the word "intentionally" when describing Defendant's activities suggested that the jury could infer from Defendant's many intentional acts on the day in question that his criminal acts were also intentional.  The use of the word did not, however, imply that intent to do these various other acts equated to *legal* intent to commit the crimes.  The prosecutor was, after all, responding to defense counsel's argument that the key events were an accident and, in context, his statements were not likely to cause confusion about the jury's duty to find the requisite intent for the underlying crimes.  Thus, we conclude that the prosecutor did not act improperly when he employed repetition as a rhetorical device to underscore the intentional nature of all of Defendant's actions on the day in question, including his criminal acts.

¶23    As noted above, the prosecutor may properly suggest that the jury draw inferences based on the evidence. *See Bakalov*, 1999 UT 45, ¶ 57.  We also note that the jury was instructed regarding the elements of the crimes, the burden of proof, and the key terms used in the instructions, including "intent," "intentionally," and "knowingly."[3]  These instructions adequately directed the jury to find intent for the

---

[3]The trial court instructed the jury that a conviction of aggravated kidnapping required the State to establish that Defendant's actions in committing the crime "were done intentionally or knowingly" and that a conviction of aggravated assault required the State to establish that Defendant "intentionally cause[d] serious bodily injury to another; or . . . use[d] a dangerous weapon or other means of force likely to produce death or serious bodily injury."  The court also instructed the jury as follows:
A person engages in conduct intentionally, or with
intent or willfully with respect to the nature of his conduct

(continued...)

underlying crimes and were phrased so as to minimize any potential confusion as to the intent element that the prosecutor's argument might otherwise have caused. Accordingly, we conclude that the prosecutor's repetition of the word "intentionally" did not mislead the jury regarding the intent element of the charges or misstate the State's burden to establish intent.

¶24    Looking at the statements to which Defendant objects in the full context of the prosecutor's argument, we do not view this as the kind of "argument which would divert the jury from its duty to decide the case on the evidence." *State v. Todd*, 2007 UT App 349, ¶ 18, 173 P.3d 170 (citation and internal quotation marks omitted), *cert. denied*, 186 P.3d 957 (Utah 2008). *See, e.g., id*. ¶¶ 19, 22, 28 (stating that prosecutors should not appeal to the prejudices of the jury, allude to matters not supported by the evidence, or misstate the law during closing argument). Instead, his statements simply reflect good advocacy, the drawing of reasonable inferences, and the effective use of a rhetorical device.

¶25    Moreover, "[i]f proof of defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial." *State v. Troy*, 688 P.2d 483, 486 (Utah 1984) (citation and internal quotation marks omitted). Here, given the extensive evidence against him, Defendant cannot prevail under either plain error or ineffective assistance of counsel because he has not demonstrated that the prosecutor's statements prejudiced him, i.e., that in the absence of the challenged statements, the outcome would likely have been more favorable to him. *See State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993) (stating that the plain error doctrine requires a defendant to demonstrate harm);

---

[3](...continued)
> or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> A person engages in conduct knowingly, or with knowledge, with respect to his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*Strickland v. Washington*, 466 U.S. 668, 692 (1984) (stating that the ineffective assistance of counsel doctrine requires a showing of prejudice). Accordingly, we conclude that the prosecutor's statements do not warrant reversing Defendant's convictions.

## II. Sentencing

¶26 Defendant argues that the trial court abused its discretion by sentencing him to life in prison without the possibility of parole for the aggravated kidnapping conviction. Specifically, Defendant contends that the court failed to adequately consider the interests of justice when it rejected evidence of mitigating factors and disregarded the role of the Board of Pardons and Parole to assess whether Defendant would eventually be able to make progress toward rehabilitation. We will not overturn a sentence on appeal "unless the trial court has abused its discretion, failed to consider all legally relevant factors, or imposed a sentence that exceeds legally prescribed limits." *State v. Nuttall,* 861 P.2d 454, 456 (Utah Ct. App. 1993).

¶27 The presumptive sentence for a conviction of aggravated kidnapping is ordinarily a term of imprisonment of fifteen years to life. *See* Utah Code Ann. § 76-5-302(3)(a) (2008). However, where, as in this case, a defendant causes serious bodily injury to another during the course of the aggravated kidnapping,[4] the presumptive sentence is imprisonment for life without parole. *See id.* § 76-5-302(3)(b). The trial court *may* impose a lesser term if it is "in the interests of justice." *See id*. § 76-5-302(4).

¶28 Defendant first argues that the trial court abused its discretion by (1) failing to consider evidence that Defendant was provoked, (2) disregarding Defendant's community and family support, and (3) failing to consider that he had no recent serious convictions. Defendant raised these factors at the sentencing hearing and now contends that the court "rejected the mitigating factors without assessing their proper merit."

¶29 Defendant's argument is unpersuasive. Defendant bears the burden to show that the trial court did not properly consider all appropriate factors. *See State v. Helms*, 2002 UT 12, ¶ 16, 40 P.3d 626. The record shows that the trial court expressly considered all of Defendant's mitigating evidence. Defendant has demonstrated no more than his disagreement with how the court weighed the mitigating factors. *See id*. ¶ 14. After

---

[4]Defendant stipulated that Girlfriend's injuries constituted "serious bodily injury" under the statute.

reviewing the court's discussion of the mitigating evidence Defendant offered, we conclude that the court adequately assessed it.

¶30 Defendant also argues that the trial court abused its discretion because the presumptive sentence of life without parole for aggravated kidnapping with serious bodily injury disregards the role of the Board of Pardons and Parole to assess whether Defendant "would be able to make progress in his rehabilitation for parole in the future." We note that the presumptive sentence is not a mandatory minimum sentence. The statutory language provides that the presumptive sentence is merely a starting point, and the trial court retains discretion to reduce the sentence based on mitigating factors and other factors in the interests of justice. *See* Utah Code Ann. § 76-5-302(4).

¶31 As an initial matter, the State argues that we should not consider this issue because Defendant failed to preserve it. Defendant contends that he preserved this claim based on his counsel's argument during the sentencing hearing in which counsel stated:

> Although what he's convicted of is extraordinarily serious, there ought to be some possibility of hope, some possibility that at some distant point in time if he can demonstrate a sufficient reformation by that time, that the State would—that the Board of Pardons would at least be in a position to consider it.

Counsel's statement clearly advocates for a sentence that would allow the Board of Pardons and Parole to assess Defendant's rehabilitation prospects at some future time. Accordingly, Defendant preserved this issue.

¶32 In support of his argument that the trial court's sentence of life without parole constituted an abuse of discretion by divesting the Board of Pardons and Parole of its discretion to consider Defendant's progress toward rehabilitation,[5] Defendant relies on *State v. Smith*, 909 P.2d 236 (Utah 1995), and *State v. Strunk*, 846 P.2d 1297 (Utah 1993), *superseded by statute on other grounds*, Utah Code Ann. § 76-3-401 (2008). In *Smith*, the trial court imposed a sentence of four consecutive terms of fifteen years to life for

---

[5]Defendant does not contend that the trial court erred by imposing consecutive sentences.

aggravated kidnapping, rape of a child, and two counts of sodomy on a child, all arising from a single criminal episode. *See* 909 P.2d at 238, 245. Recognizing that the four consecutive terms effectively constituted a minimum sentence of sixty years, which the Utah Supreme Court deemed "tantamount to a minimum mandatory life sentence," *id.* at 244, the Court vacated the sentence and remanded for resentencing. *See id.* at 245. Similarly, in *Strunk*, a sixteen-year-old defendant received consecutive sentences totaling twenty-four years and the Court vacated his sentence and remanded for resentencing. *See Strunk*, 846 P.2d at 1298, 1301–02.

¶33  In both cases, the Utah Supreme Court focused on the role of the Board of Pardons and Parole when considering whether the lower courts had abused their discretion by imposing consecutive sentences. In *Smith*, the Court focused on the "wide latitude" that the Board of Pardons has to decide "what a maximum sentence ought to be" and noted that the Board "is in a far better position than a court to monitor a defendant's subsequent behavior and possible progress toward rehabilitation while in prison and to adjust the maximum sentence accordingly." 909 P.2d at 244. In *Strunk*, the Court stated that "the twenty-four-year [minimum] term rob[bed] the Board of Pardons of any flexibility to parole [the defendant] sooner," 846 P.2d at 1301, and that the trial court "fail[ed] to sufficiently consider defendant's rehabilitative needs in light of his extreme youth and the absence of prior violent crimes," *id*. at 1302.

¶34  We are not persuaded that the trial court in this case abused its discretion by imposing a sentence that precludes the Board of Pardons and Parole from considering Defendant's progress toward rehabilitation. First, the Legislature expressly provided for a presumptive sentence of life without parole for Defendant's crime. Practically speaking, the presumptive sentence itself, not an exercise of *judicial* discretion, forecloses the usual role of the Board of Pardons and Parole. Second, implicit in the statutory language establishing the presumptive sentence of life without parole is the Legislature's judgment that rehabilitation is not a primary goal for defendants convicted under this statute.[6] *See Graham v. Florida*, 130 S. Ct. 2011, 2029–30 (2010) ("A

---

[6]"Incarceration may be for purposes other than rehabilitation." *State v. Bishop*, 717 P.2d 261, 268 (Utah 1986). Retribution, deterrence, and incapacitation are other penalogical justifications that have been recognized as legitimate. *See Ewing v. California*, 538 U.S. 11, 25 (2003) (plurality opinion).

sentence of life imprisonment without parole . . . forswears altogether the rehabilitative ideal.").

¶35    "The apportionment of punishment entails, in Justice Frankfurter's words, 'peculiarly questions of legislative policy.'" *Solem v. Helm*, 463 U.S. 277, 314 (1983) (Burger, C.J., dissenting) (citation omitted). "Legislatures are far better equipped [than courts] to balance the competing penal and public interests and to draw the essentially arbitrary lines between appropriate sentences for different crimes," *id.*, and therefore, we defer to the Legislature's determination regarding criminal penalties.[7] *See State v. Bishop*, 717 P.2d 261, 269 (Utah 1986) ("[S]ubstantial deference must be accorded to the prerogatives of legislative power 'in determining the types and limits of punishments for crimes.'") (quoting *Solem*, 463 U.S. at 290).

---

[7]We would be remiss if we did not note that the sentence in this case does, indeed, seem drastic, not only when considered in the context of the crime at issue, but also when this sentence is compared to sentences recently imposed for other, more heinous acts. For example, one defendant fatally beat and stabbed his girlfriend in an attack the trial court described as "brutal in the extreme." Brooke Adams, *"Demons" Will be with You, Killer Told*, Salt Lake Tribune, Sept. 10, 2011, at B1. Another defendant stabbed his victim fourteen times in an altercation about a cigarette. *See* Stephen Hunt, *Ogden Man Gets up to Life for 2009 Slaying*, Salt Lake Tribune, Sept. 10, 2011, at B3. Both defendants were convicted of murder, yet each received a sentence of fifteen years to life. As compared to those cases, it is troubling that Defendant would receive a sentence of life without the possibility of parole for crimes which, while very serious, did not include a homicide.

Nevertheless, we recognize that "[o]utside the context of capital punishment" successful challenges based on a proportionality argument are "exceedingly rare," *Solem v. Helm*, 463 U.S. 277, 289–90 (1983) (citation and internal quotation marks omitted), which no doubt explains why Defendant did not raise this argument. *See, e.g., Harmelin v. Michigan*, 501 U.S. 957, 994–96 (1991) (upholding a mandatory life sentence without possibility of parole for possession of more than 650 grams of cocaine even though the defendant had no prior felony convictions). *But see Solem*, 463 U.S. at 281, 303 (holding that a life sentence without the possibility of parole for the crime of uttering a "no account" check for $100 was unconstitutionally harsh).

¶36    We recognize that Utah has an "acknowledged policy of ensur[ing] that the Board of Pardons is given the appropriate opportunity to determine the ultimate length of an individual's sentence." *State v. Spencer*, 2011 UT App 219, ¶ 12, 258 P.3d 659 (alteration in original) (citation and internal quotation marks omitted). *See Smith*, 909 P.2d at 244 ("[T]he Board of Pardons [has] wide latitude in deciding what a maximum sentence ought to be."). Nevertheless, its authority is not unlimited. *See* Utah Const. art. VII, § 12(2)(a) ("The Board of Pardons and Parole . . . may grant parole . . . , *subject to regulations as provided by statute.*") (emphasis added); Utah Code Ann. § 77-27-5(1)(a) (Supp. 2012) ("The Board of Pardons and Parole shall determine . . . when and under what conditions, *subject to this chapter and other laws of the state*, persons committed to serve sentences in . . . all felony cases . . . may be released upon parole[.]") (emphasis added). "[T]he Legislature is specifically authorized to enact standards governing when persons convicted of various crimes are eligible for parole." *Bishop*, 717 P.2d at 264. *See*, *e.g.*, Utah Code Ann. § 76-3-201(2) (Supp. 2012) ("Within the limits prescribed by this chapter, a court may sentence a person convicted of an offense to any one of the following sentences or combination of them: . . . (e) . . . to life in prison without parole[.]"). Thus, when the Legislature amended the aggravated kidnapping statute to make life without parole the presumptive sentence for Defendant's offense, it essentially countermanded, for this crime, Utah's long-standing sentencing philosophy of indeterminate sentencing, which typically vests discretion in the Board of Pardons and Parole to determine the actual time served by a defendant. This policy judgment is reinforced in section 76-3-406 of the Utah Code, which specifically states that "probation shall not be granted, the execution or imposition of sentence shall not be suspended, [and] the court shall not enter a judgment for a lower category of offense, . . . the effect of which would in any way shorten the prison sentence for any person who commits . . . a first degree felony involving . . . aggravated kidnaping." Utah Code Ann. § 76-3-406 (Supp. 2012).[8]

¶37    By establishing a presumptive sentence of life in prison without the possibility of parole when aggravated kidnapping results in serious bodily injury, the Legislature

---

[8]We note that the Board retains some limited authority over a defendant sentenced to life without parole. *See* Utah Code Ann. § 77-27-9(6) (Supp. 2012) ("The board may parole a person sentenced to life in prison without parole if the board finds by clear and convincing evidence that the person is permanently incapable of being a threat to the safety of society.").

clearly identified what it considers to be an appropriate sentence for this serious crime. Here, the trial court's sentence was consistent with the presumptive sentence under section 76-5-302(3)(b) of the Utah Code. We therefore conclude that the court did not abuse its discretion by imposing a sentence that precludes the Board of Pardons and Parole from performing its usual role in Defendant's case.

CONCLUSION

¶38 The prosecutor's statements during closing argument do not warrant reversing Defendant's convictions. The trial court adequately considered Defendant's proffered mitigating evidence and did not abuse its discretion by sentencing Defendant to life in prison without the possibility of parole for his conviction of aggravated kidnapping.

¶39 Affirmed.

_____
Gregory K. Orme, Judge

-----

¶40 WE CONCUR:

_____
Stephen L. Roth, Judge

_____
Michele M. Christiansen, Judge